IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 19, 2015

**ANDREW MANN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 100942     Mary Beth Leibowitz, Judge**

---

**No. E2014-01524-CCA-R3-PC – Filed June 12, 2015**

---

The Petitioner, Andrew Mann, appeals as of right from the Knox County Criminal Court's denial of his petition for post-conviction relief. The Petitioner contends that he received ineffective assistance from his trial counsel due to trial counsel's advice that he testify in his own defense. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the Appellant, Andrew Mann.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

In June 2007, the then twenty-one-year-old Petitioner shot and killed the father and stepmother of his then fifteen-year-old girlfriend, Amanda McGhee, at her behest. State v. Andrew Mann, No. E2010-00601-CCA-R3-CD, 2012 WL 184157 (Tenn. Crim. App. Jan. 23, 2012), perm. app. denied (Tenn. June 20, 2012). Following a jury trial, the Petitioner was convicted of two counts of first degree premeditated murder and was sentenced to two consecutive life terms. Ms. McGhee ultimately pled guilty to two counts of second degree murder and received an effective sentence of forty-five years.

The evidence at trial established that Ms. McGhee and the Petitioner planned to kill the victims after Ms. McGhee discovered she was pregnant with the Petitioner's child.  Id.

Ms. McGhee's father's body was found in his bed with a gunshot wound to the back of his head.  Mann, 2012 WL 184157, at *3.  Ms. McGhee's stepmother's body was found in a hallway with gunshot wounds to her back and arm.  One of Ms. McGhee's friends testified at trial that she had been given "a Crown Royal bag" by Ms. McGhee to give to the Petitioner.  Id. at *2.  The friend further testified that when she gave the bag to the Petitioner, he revealed to her that it contained a gun.  According to Ms. McGhee's friend, she asked the Petitioner "if he intended to kill [Ms. McGhee's] parents," and the Petitioner "just smiled."  The friend further testified that the Petitioner told her that he was going to kill Ms. McGhee's parents because "he did not want to go to jail," which she took to mean that the Petitioner was afraid Ms. McGhee's parents "would press a statutory rape charge against him."  Id.

The Petitioner's friend, Christopher Kirkland, testified at trial that a few days before the murders, the Petitioner "expressed his anger at [Ms. McGhee's] parents for trying to keep . . . them apart because of their age and stated that he wanted to shoot and kill them."  Mann, 2012 WL 184157, at *2.  The Petitioner and Mr. Kirkland then had a conversation about how best to kill the victims, and Mr. Kirkland agreed to "help in killing the victims."  Mr. Kirkland testified that on the morning of the murders, he received a phone call from the Petitioner.  The Petitioner told him that he was in Ms. McGhee's father's bedroom and that her father was asleep, "facing away from" him.  The Petitioner wanted to know if he should shoot Ms. McGhee's father "in the back of the head because he could not shoot him in the front of the head."  Mr. Kirkland testified that he told the Petitioner, "I don't know," and hung up the phone.  Id.

Mr. Kirkland further testified that the Petitioner called him later that day and requested that he come to Ms. McGhee's house to see her father's body.  Mann, 2012 WL 184157, at *2.  According to Mr. Kirkland, he met the Petitioner and Ms. McGhee, who told him that they planned on killing Ms. McGhee's stepmother "when she returned home from work . . . because otherwise she would be a witness to the murder[]."  Mr. Kirkland testified that it seemed to him that killing Ms. McGhee's stepmother was the Petitioner's idea and that Ms. McGhee "did not want to do it."  Mr. Kirkland believed that the Petitioner was "calling the shots."  Mr. Kirkland stated that when he saw the body, he "freaked out" and fled the house.  Mr. Kirkland further stated that he met with the Petitioner and Ms. McGhee again later that night, and "they acted as if nothing had happened."  Mr. Kirkland testified that the Petitioner tried to get him to help dispose of the bodies.  Id.

Mr. Kirkland testified on cross-examination that the Petitioner had told him that Ms. McGhee "was being physically abused by her father and that the [Petitioner] was

worried for her safety." Mann, 2012 WL 184157, at *3. Mr. Kirkland also admitted that the Petitioner had told him about an incident where Ms. McGhee's father had threatened the Petitioner with a gun and taken the Petitioner's identification. In addition to the foregoing evidence, two recorded confessions made by the Petitioner were played for the jury. Id. at *1. At the close of the State's proof, the Petitioner sought to have two experts testify regarding his mental capacity at the time of the murders. Id. at *3. The State objected to the experts' testimony because "neither expert could testify with a reasonable degree of scientific or medical certainty" that the Petitioner lacked the mental capacity to form premeditation. The trial court took the issue under advisement, and the Petitioner was called to testify.[1] Id.

Before the Petitioner testified in front of the jury, the trial court had him sworn in and conducted a brief hearing.[2] The trial court informed the Petitioner of his right to testify and the converse right to remain silent, and explained the potential consequences of each option. The following exchange then occurred:

[Trial court]: I've told you about your two options. This is the last thing I need to tell you about, and this is very important. And that is that this is your decision. Okay? This isn't [trial counsel's] decision . . . . It's your decision.

[The Petitioner]: Yes, sir.

[Trial court]: All right. So if [trial counsel] says I think you ought to get up here on the stand and you disagree with him, you don't think you ought to do that for whatever reason, you're the one that makes the decision. Okay.

[The Petitioner]: Yes, sir.

[Trial court]: And if you guys disagree, you prevail. You understand?

[The Petitioner]: Yes, sir.

---

[1] The trial court ultimately ruled that the experts' testimony was not relevant, and they did not testify at the Petitioner's trial.

[2] The trial court was conducting a hearing pursuant to Momon v. State, 18 S.W.3d 152 (Tenn. 1999), which outlined a prophylactic procedure designed to insure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent. See Mobley v. State, 397 S.W.3d 70, 90-91 (Tenn. 2013). However, said procedure was not required prior to the Petitioner's testimony as our supreme court has "respectfully decline[d] to extend the reach of the prophylactic procedure in Momon to instances in which a criminal defendant elects to testify." Id. at 90.

[Trial court]: So I don't want to hear you, you know, a year from now come up here and say, now, Judge, I didn't want to testify but he made me. Okay. Because this is your chance to -- you're the one that gets to call the shots here. All right. So you understand that?

[The Petitioner]: Yes, I do.

[Trial Court]: Okay. Now, have you thought about this and talked to your lawyers? The other thing I want to tell you is, obviously I want you to consult with your lawyers, they know what they're doing, and I certainly want you to talk to them and consult with them, and listen to what they've got to say, but I just want you to know that you're the one that gets to make the final decision here. Okay?

[The Petitioner]: Yes, sir.

[Trial court]: So you understand all that?

[The Petitioner]: Yes sir, I do.

[Trial court]: Okay. Have you had an opportunity to think about it? Have you made a decision about what you want to do?

[The Petitioner]: Yes, sir.

[Trial court]: And what is that decision?

[The Petitioner]: I need to testify.

[Trial court]: You're going to testify?

[The Petitioner]: Yes, sir.

After this brief hearing, the Petitioner testified that Ms. McGhee "had repeatedly told him that she was being physically abused by her father," begged the Petitioner to kill her father, and threatened to kill herself if the Petitioner did not kill him. Mann, 2012 WL 184157, at *4. The Petitioner recalled an incident where Ms. McGhee's father threatened him with a gun and took his identification. The Petitioner testified that after that incident, Ms. McGhee told him that she was pregnant with his child. The Petitioner claimed that Ms. McGhee also told him that her father was hitting her "every single day" and that she was afraid she was going to have a miscarriage. The Petitioner further claimed that Ms. McGhee told him not to call the police and that once her father found

-4-

out that she was pregnant, "he would put the [Petitioner] in jail for statutory rape and force her to have an abortion." Id.

The Petitioner testified that Ms. McGhee came up with the plan to kill her father and her stepmother. Mann, 2012 WL 184157, at *4. The Petitioner claimed that he was reluctant to go through with it, but did so because he "did not want to lose" Ms. McGhee. The Petitioner testified that on the day of the murders, Ms. McGhee called him "every thirty seconds" and repeatedly told him that it had "to be done." The Petitioner further testified that he went to Ms. McGhee's house to tell her that he could not go through with the killings, but he ended up in the bedroom where Mr. McGhee's father was sleeping. The Petitioner claimed that he called Mr. Kirkland to ask how to kill Ms. McGhee's father, and Mr. Kirkland told him to shoot Ms. McGhee's father in the back of the head, so he did. The Petitioner further claimed that after the shooting, Ms. McGhee came to him and said that they were "one step down, one step to go." Id.

The Petitioner testified that he left the house and returned later that day. Mann, 2012 WL 184157, at *4. According to the Petitioner, Ms. McGhee called her stepmother to ask when she would be home and told her "that she loved her." The Petitioner claimed that he again told Ms. McGhee that he could not "do this," but she told him that it was "too late" and that he had "to do it." The Petitioner testified that he and Ms. McGhee argued about killing her stepmother until her stepmother came home from work. The Petitioner claimed that he asked Ms. McGhee's stepmother to sit down and talk, hoping that she "would pull out a phone and call the police." Instead, Ms. McGhee's stepmother ran toward the kitchen, and the Petitioner shot her twice in the back. The Petitioner claimed that after he shot Ms. McGhee's stepmother, Ms. McGhee started laughing and said that they would be "together forever." Id.

The jury convicted the Petitioner of two counts of first degree premeditated murder, and the trial court sentenced him to consecutive life sentences. The Petitioner appealed to this court, which upheld his convictions and sentences. Mann, 2012 WL 184157, at *1. Our supreme court declined to review this court's opinion. The Petitioner thereafter filed a timely pro se petition seeking post-conviction relief. Counsel was appointed and an amended petition was filed claiming that trial counsel was ineffective for advising the Petitioner to testify at trial. After the amended petition was filed, the Petitioner filed a second pro se petition.[3] On June 3, 2014, the post-conviction court held a hearing at which both the Petitioner and trial counsel testified.

---

[3] The Petitioner's pro se petitions raised several other issues which were addressed by the post-conviction court. However, the Petitioner has not raised those issues in his appellate brief; therefore, he has waived review of those issues in this court.

The Petitioner testified that at trial he was represented by the Knox County Public Defender and two other attorneys from his office. The Petitioner further testified that the attorneys met with him and discussed the evidence against him, as well as potential trial strategies. The Petitioner recalled that he spoke with his attorneys about the possibility of his testifying at trial but that they "were trying to work on this psychological evaluation," which was to be "the focus of the trial." The Petitioner testified that once the trial court ruled that his expert witnesses would not be allowed to testify, his attorneys advised him to testify on his own behalf. The Petitioner testified that prior to trial he "really didn't" want to testify but that his attorneys advised him that "it would be in [his] best interest to testify."

The Petitioner admitted that his attorneys did not force him to testify or tell him that he did not have "any choice in the matter." The Petitioner also admitted that his two recorded confessions had been admitted at trial and that they were "bad for" him because he "acknowledged planning and executing" the murders in both confessions. The Petitioner testified that after his statements were admitted and his expert witnesses were not allowed to testify, he got the sense that his attorneys felt his testimony was "all [they] had . . . to try to . . . steer away from a first degree murder" conviction. The Petitioner testified that he felt his testimony ended up hurting his defense despite the fact that the State presented "a very strong case against" him.

Trial counsel testified that he was the Knox County Public Defender and that he and "a defense team" represented the Petitioner. Trial counsel explained that the defense team consisted of himself, two Assistant Public Defenders, an administrative assistant, an investigator, and a social worker. Trial counsel testified that he filed a motion to suppress the Petitioner's confessions but that the motion was overruled prior to trial. Trial counsel testified that the Petitioner's confessions were "very, very troubling in terms of the issue[] of premeditation." Trial counsel also testified that he had the Petitioner evaluated by mental health experts to determine if there was a possible insanity defense or that the Petitioner lacked the mental capacity to form premeditation or intent. According to trial counsel, the experts were not able to conclude that the Petitioner was insane or lacked the mental capacity to form premeditation at the time of the murders.

Trial counsel testified that he attempted to have the expert witnesses testify anyway to establish the Petitioner's "mental limitations" that caused him to be "more easily lead astray and more vulnerable." However, the trial court ultimately ruled that the experts could not testify. Trial counsel testified that losing his expert witnesses was very problematic given that the Petitioner's confessions "were rich in terms of premeditation and planning" and that there was evidence of "disregard for what [the Petitioner and Ms. McGhee had done] afterwards using credit cards and shopping and eating and that sort of stuff." Trial counsel testified that he felt "the best thing [he] could do at that point" was

to have the Petitioner testify to "try to get the jury to see his limitations and his susceptibility." Trial counsel explained that he felt "that was a better strategy than just leaving those statements out there and letting it go."

Trial counsel opined that even if the Petitioner did not testify at trial, "there would [not] have been any difference" because, given the evidence against the Petitioner, "the outcome was inevitable." Trial counsel testified that the defense team met with the Petitioner forty-nine times prior to trial and that he emphasized to the Petitioner that the decision to testify was "his and his alone to make." Trial counsel also testified that in murder cases, the defense team will typically do a mock direct and cross-examination with a defendant three times to "get a sense of what it's going to be like." Trial counsel could not specifically recall doing that with the Petitioner, but he "would imagine [they] did it with" the Petitioner. Trial counsel testified that everyone on the defense team believed that the Petitioner should have testified at trial.

At the conclusion of the post-conviction hearing, the Petitioner's counsel stated that he was "not arguing and [could not] argue that the State could not have proved this case had [the Petitioner] not testified. But his testimony did nothing but reinforce the State's case." The post-conviction court entered a written order denying the petition on July 8, 2014. The post-conviction court found that the Petitioner "had outstanding and holistic representation in this case" and that trial counsel's "competence far exceeded" the minimum standards of effective assistance required by the Sixth Amendment. The post-conviction court held that the Petitioner "made his own decision to testify and cannot now withdraw it" and that, in advising the Petitioner to testify, trial counsel was attempting "to present the only mitigating evidence available." The post-conviction court also held that had the Petitioner not testified, it would not "have made any difference in the outcome of the trial" given the overwhelming evidence of his guilt.

ANALYSIS

The Petitioner contends that the post-conviction court erred in denying his petition. The Petitioner argues that his testimony at trial "only reinforced the State's allegations against him"; therefore, trial counsel was ineffective in advising him to testify. The State responds that the Petitioner's argument is merely an attempt to second-guess trial counsel's strategic and tactical decisions. The State also responds that the Petitioner has failed to show how he was prejudiced by his decision to testify at trial.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const.

amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

At the outset, we note that the Petitioner freely and voluntarily decided to invoke his right to testify at trial. The Petitioner stated as much to the trial court, under oath, after a thorough explanation of his rights and immediately prior to his testimony. At the post-conviction hearing, the Petitioner again testified that he decided to testify at trial and that his attorneys did not coerce him. Likewise, trial counsel testified that he discussed with the Petitioner his right to testify and explained that the decision was "his and his alone to make." Trial counsel also testified that the defense team worked with the Petitioner prior to trial to prepare him to testify. With regard to the Petitioner's claim that trial counsel's advice that he testify at trial amounted to deficient performance, we note that the Petitioner's testimony provided some of the only evidence at trial that mitigated the State's overwhelming proof regarding premeditation.

Trial counsel testified that he attempted to suppress the Petitioner's confessions to the police, which were "very, very troubling" regarding the element of premeditation. Trial counsel also attempted to present mental health experts in an effort to establish that the Petitioner's "mental limitations" caused him to be "more easily lead astray and more vulnerable." With the Petitioner's confessions admitted into evidence and his experts not allowed to testify, trial counsel believed that the Petitioner's testimony would allow "the jury to see [the Petitioner's] limitations and his susceptibility" and was "the best thing [he] could do at that point." This was a reasonable strategic decision by trial counsel, and the Petitioner is not entitled to the benefit of hindsight to second-guess it on post-conviction review. See Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

Furthermore, the Petitioner has not established that he was prejudiced by his decision to testify at trial. The Petitioner's counsel admitted as much at the post-conviction hearing, stating that he could not "argue that the State could not have proved this case had [the Petitioner] not testified." The evidence of premeditation was overwhelming, including two confessions by the Petitioner, testimony from Ms. McGhee's friend, and testimony from Mr. Kirkland. In particular, Mr. Kirkland testified that he believed the Petitioner was "calling the shots" on the day of the murders. Accordingly, we cannot conclude that a reasonable probability exists that, but for the Petitioner's testimony, the result of the proceeding would have been different. Therefore, we affirm the post-conviction court's denial of the Petitioner's petition for post-conviction relief.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE